Scott A. Flaxman SBN 241285
700 Larkspur Landing Circle, Suite #199
Larkspur, California 94939
(415) 702-7032

UNITED STATES DISTRICT COURT

CALIFORNIA NORTHERN DISTRICT COURT

OAKLAND DIVISION

| | |
|---|---|
| **MAURICIO AYLLON UNZUETA,**<br><br>        **Plaintiff,**<br><br><br>        **V.**<br><br><br>**CITY OF BERKELEY and DOES 1**<br><br>**through 10,**<br><br>        **Defendants.** | Case No.:<br><br>**COMPLAINT FOR:**<br><br>1. **Violation of Fourth Amendment Rights Under 42 USCS § 1983 - Unreasonable Seizure/Arrest Without Probable Cause**<br><br>2. **Municipal Liability**<br><br>Date:<br>Time:<br>Dept.:<br>Judge:<br><br><br>Trial Date: |

Plaintiff, complaining of the Defendants, alleges and says:

MAURICIO AYLLON UNZUETA V. CITY OF BERKELEY AND DOES 1 THROUGH 10  - 1

**PARTIES**

1. Plaintiff Mauricio Ayllon Unzueta is a resident of California.

2. Defendant City of Berkeley is a municipal corporation organized under the laws of California with its principal place of business in Berkeley, California.

3. The true names and capacities of defendants Does 1 through 10 are unknown to plaintiff at this time, and plaintiff will seek leave to amend this complaint when their identities become known.

**JURISDICTION AND VENUE**

4. This Court has subject matter jurisdiction because the action arises under the Constitution and laws of the United States, including Plaintiff's claims for deprivation of federal constitutional rights by persons acting under color of state law.

5. This Court has personal jurisdiction over Defendant City of Berkeley because it is a municipal corporation located in California.

6. This Court has personal jurisdiction over Does 1 through 10 because each Doe Defendant resides in California and  committed the acts and omissions alleged in this Complaint in California, including within this District, causing harm to Plaintiff in this District.

7. Venue is proper in this District because a substantial part of the events or omissions giving rise to the claims occurred in Berkeley, California, within the Northern District of California.  *28 USCS § 1391*

**STATEMENT OF FACTS**

8. On October 2, 2024, Plaintiff's wife, Iblim Velez Torrico, called the Berkeley Police Department to report that Plaintiff had threatened to upload a consensual sex video of them online, and she contacted authorities because she believed police could stop Plaintiff from posting the video.

9. During the police interview, a Spanish-speaking officer asked Ms. Velez Torrico whether Plaintiff had ever threatened her life.

10. In response to that question, Ms. Velez Torrico mentioned a spontaneous comment Plaintiff had made while they were watching a crime documentary together: "If I ever killed you they would never find your body".

11. Ms. Velez Torrico clarified to the officer that Plaintiff's phrasing was "I would kill you" rather than "I am going to kill you".

12. Ms. Velez Torrico did not intend to report the documentary comment as an actual death threat, did not tell the officer that Plaintiff had threatened to kill her, and did not mention metals or any specific method of harm.

13. The documentary comment was made while Plaintiff and Ms. Velez Torrico were enjoying their time together with no issues between them.

14. Although Ms. Velez Torrico confirmed to officers that she was afraid, her fear at that time related entirely to the threatened posting of the private sex video online, and she did not explain that nuance because she was overwhelmed by the number of questions.

15. Later that day, October 2, 2024, at approximately 7:08 p.m., Berkeley Police Department Officers Tom Stern and Steve Rego arrested Plaintiff at Cesar

Chavez Park in Berkeley, California, charging him with violations of California Penal Code section 422 (Threaten Crime with Intent to Terrorize) and section 136.1 (Prevent/Dissuade Victim/Witness).

16. Officer Tom Stern authored a police report documenting the arrest, in which he documented that Plaintiff "told his wife that he could kill her using different metals and no one would be able to find her".

17. Plaintiff alleges that this documented statement was false and did not accurately reflect what Ms. Velez Torrico reported to police.

18. Officer Steve Rego, identified as the supervising officer, reviewed and approved the police report.

19. Before arresting Plaintiff, Officers Stern and Rego did not attempt to obtain corroborating evidence for any alleged threat to kill, did not interview readily available witnesses who were present for or contemporaneously aware of the relevant interactions, and did not seek clarification from Ms. Velez Torrico regarding whether she intended to report a death threat or whether she feared imminent harm.

20. Plaintiff was detained in custody from October 2, 2024, until October 3, 2024, when he was released on bail.

21. Plaintiff alleges that, consistent with systemic failures, after Plaintiff's arrest Berkeley police altered Plaintiff's video recording of the police interaction, retaining only the last few seconds.

22. Plaintiff alleges that the alteration described above concerns a video recording belonging to Plaintiff, and that the retained portion consists only of the last few seconds of the interaction.

MAURICIO AYLLON UNZUETA V. CITY OF BERKELEY AND DOES 1 THROUGH 10   - 4

23. Ms. Velez Torrico, in her Declaration, clarified that she never told the officer her husband had threatened to kill her and that she did not mention anything about metals. (See Exhibit 1)

24. Ms. Velez Torrico stated that "the officer completely misrepresented what she had explained to him," and confirmed she called police because Plaintiff had threatened to upload their private sex video online, not due to any death threat. (See Exhibit 1)

25. On May 13, 2025, a charging deputy district attorney for Alameda County reviewed the police report and concluded there was "lack of evidence to file a criminal complaint".

26. As a direct result of the arrest and detention from October 2-3, 2024, Plaintiff incurred economic losses including criminal defense attorney fees, private investigator fees, and bail bond costs.

27. As a direct result of the arrest and detention from October 2-3, 2024, Plaintiff suffered lost wages from missed work days and incurred hotel costs.

28. As a direct result of the arrest and detention, Plaintiff's property was seized, including his cell phone, laptop, and external hard drive.

29. As a direct result of the arrest and detention, Plaintiff suffered and continues to suffer immigration-related consequences, including that his visa was revoked and his Green Card application was delayed, and that he has been unable to leave the country to visit aging parents in emergency situations.

30. As a direct result of the arrest and detention, Plaintiff suffered non-economic damages including reputational harm from disclosure at the workplace and

severe emotional distress and anxiety, requiring professional therapy and mental health treatment.

31. As a direct result of the arrest and detention, Plaintiff will continue to suffer prospective harms including difficulty obtaining future security clearance for scientific work.

32. In December 2025, Plaintiff filed a police misconduct complaint with the Berkeley Police Accountability Office.

## CLAIMS FOR RELIEF

### Count I - Violation of Fourth Amendment Rights Under 42 USCS § 1983 - Unreasonable Seizure/Arrest Without Probable Cause
(against Defendant City of Berkeley)

34. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 33 as if fully set forth herein.

35. At all relevant times, the City of Berkeley, through Officers Tom Stern and Steve Rego, acted under color of state law as Berkeley police officers when they arrested Plaintiff.

36. Officers Stern and Rego were acting pursuant to the City of Berkeley's customs, practices, and policies when they arrested Plaintiff.

37. Defendant seized Plaintiff's person.

38. On October 2, 2024, at approximately 7:08 p.m., Officers Stern and Rego arrested Plaintiff at Cesar Chavez Park in Berkeley, California, and Plaintiff was

MAURICIO AYLLON UNZUETA V. CITY OF BERKELEY AND DOES 1 THROUGH 10  - 6

detained until October 3, 2024.

39. This arrest and detention constituted a seizure of Plaintiff's person within the meaning of USCS Const. Amend. 4.

40. Plaintiff is informed and believes, and on that basis alleges, that the arrest on October 2, 2024 was made without an arrest warrant.

41. Under the Fourth Amendment, a warrantless arrest is reasonable only if supported by probable cause, and probable cause must be assessed based on the totality of the circumstances known to the officers at the time. *(USCS Const. Amend. 4, Hill v. City of Fountain Valley, 70 F.4th 507, United States v. Lopez, 482 F.3d 1067.)*

42. Plaintiff is informed and believes, and on that basis alleges, that no exception justified arresting Plaintiff absent probable cause, because the officers relied on their own report narrative rather than on reasonably trustworthy information establishing a fair probability that Plaintiff had committed an offense. *(Hill v. City of Fountain Valley, 70 F.4th 507, United States v. Lopez, 482 F.3d 1067.)*

43. Probable cause requires knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe an offense has been or is being committed, and mere suspicion, common rumor, or even strong reason to suspect is insufficient. *(United States v. Lopez, 482 F.3d 1067)*

44. Here, the arrest rested on materially false and misleading assertions attributed to Plaintiff's wife, rather than on reasonably trustworthy information establishing that Plaintiff had committed a crime.

45. Specifically, the arrest was based on Officer Stern's false documentation that Plaintiff "told his wife that he could kill her using different metals and no one

would be able to find her," and treated that statement as a credible threat supporting arrest.

46. This documentation did not accurately reflect what Plaintiff's wife reported to police, materially altering the meaning of the statement.

47. Plaintiff's wife clarified that she never reported a death threat and that the officer completely misrepresented what she had explained to him. She further affirmed that she never stated anything regarding the use of "metals" to harm her, underscoring the fabricated nature of the arresting officer's documentation.

48. To constitute the suspected criminal threat offense, the facts known to the officers had to support, among other things, an unequivocal and immediate threat of death or great bodily injury, made with the intent that it be taken as a threat, that caused sustained fear that was reasonable under the circumstances. *(Latter-Singh v. Holder, 668 F.3d 1156)*

49. Prior to arrest, Officers Stern and Rego did not attempt to obtain readily available investigative steps that would have resolved credibility concerns and obvious ambiguities, including verifying corroborating evidence, interviewing readily available witnesses, and seeking clarification from Plaintiff's wife regarding whether she intended to report a death threat or feared imminent harm.

50. Officer Stern personally participated in the constitutional violation by authoring the report narrative that Plaintiff alleges contained materially false and misleading assertions and by participating in the arrest that followed. *(Nicholson v. City of L.A., 935 F.3d 685)*

51. Officer Rego, as supervising officer, personally participated in the constitutional violation by reviewing and approving the false police report without verification,

pursuant to the City's supervisory policies and customs, thereby contributing to the sequence of events that resulted in Plaintiff's seizure. *(Nicholson v. City of L.A., 935 F.3d 685, Starr v. Baca, 652 F.3d 1202)*

52. An objectively reasonable officer would have concluded that probable cause for Plaintiff's arrest was absent, as basic corroboration would have revealed that the officers failed to accurately document the reporting party's account and the actual facts reported by Plaintiff's wife did not support the necessary factual basis.

53. Plaintiff alleges that, as a direct result of the arrest and detention from October 2 to October 3, 2024, he incurred economic losses including criminal defense attorney fees, private investigator fees, and bail bond costs, and suffered additional harms including lost wages, hotel costs, seizure of property, immigration-related consequences, reputational harm, and emotional distress.

54. On May 13, 2025, a charging deputy district attorney for Alameda County reviewed the police report and concluded there was a "lack of evidence to file a criminal complaint," further underscoring the absence of reasonably trustworthy information supporting probable cause.

**Count II - Municipal Liability Under 42 USCS § 1983 - Failure to Train and Implement Policy**
(against Defendant City of Berkeley)

55. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 54 as if fully set forth herein.

56. A municipality may be liable under 42 U.S.C. § 1983 for a failure to train where the failure amounts to deliberate indifference to the rights of persons who deal

with municipal employees, and mere negligence is insufficient. *(Benavidez v. Cty. of San Diego, 993 F.3d 1134)*

57. To plead municipal liability based on failure to train, Plaintiff must allege facts supporting a reasonable inference of (1) a constitutional violation, (2) a municipal training policy amounting to deliberate indifference, and (3) that the injury would not have resulted if the municipality properly trained its employees. *(Alvarez v. City of Santa Ana, 802 F. Supp. 3d 1186, Benavidez v. Cty. of San Diego, 993 F.3d 1134.)*

58. Plaintiff was deprived of rights secured by the Fourth Amendment to the United States Constitution, including the right to be free from unreasonable seizure, specifically arrest without probable cause.

59. This deprivation was caused by the City's deficient training and supervision practices because they allowed Officer Stern to document a materially altered "metals" narrative as the basis for arrest, and allowed Officer Rego to approve that narrative without documented verification, resulting in Plaintiff's warrantless arrest and detention.

60. The City's practices and supervision structure, as implemented in this incident, permitted a warrantless arrest to proceed based on a materially embellished or fabricated paraphrase of key "threat" language in a domestic or interpersonal dispute context, without requiring the arresting officer to preserve the reporting party's exact words in a reliable form.

61. Specifically, Officer Stern's report improperly escalated the incident by inventing a "kill her using different metals" narrative and "fear for her life" assertions, and Officer Rego approved this false narrative without proper, documented verification.

MAURICIO AYLLON UNZUETA V. CITY OF BERKELEY AND DOES 1 THROUGH 10   - 10

62. The City failed to require element-by-element report checklists for criminal threat arrests addressing immediacy, specificity, and sustained fear.

63. Both officers acted pursuant to the City's deficient customs and practices.

64. The municipality had notice of a pattern of similar constitutional violations or a known risk of constitutional violations.

65. The City of Berkeley had notice of a pattern of similar constitutional violations or a known risk of constitutional violations, including recurring issues regarding report accuracy, supervision of report approvals, and evidence preservation in domestic or interpersonal-violence calls.

66. Consistent with these systemic failures, after Plaintiff's arrest Berkeley police altered Plaintiff's video recording of the police interaction, retaining only the last few seconds, reflecting deficiencies in evidence preservation and accountability relevant to the reliability of arrest documentation and review.

67. Prior to October 2, 2024, City policymakers had notice of a risk of constitutional violations arising from inaccurate report documentation, inadequate supervisory review of report approvals, and deficient evidence preservation practices in domestic or interpersonal-violence calls, but that the specific details of prior complaints, audits, or internal findings are uniquely within the City's possession and will be the subject of discovery.

68. The City failed to require meaningful supervisory review that would verify arrest narratives. This failure to train, supervise, and audit, despite notice of the risk, constitutes deliberate indifference.

69. As a result of the City's unconstitutional conduct, Plaintiff suffered severe injuries as a result of the arrest and detention, including economic losses

(criminal defense attorney fees, private investigator fees, bail bond costs, lost wages, and hotel costs), seizure of property (cell phone, laptop, external hard drive), immigration-related consequences (visa revocation and delayed Green Card application), reputational harm, and emotional distress requiring therapy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

1. Compensatory damages against Defendant City of Berkeley for all economic and non-economic losses resulting from the municipal policies, customs, or practices that caused Plaintiff's constitutional deprivation, in an amount to be determined at trial.

2. Compensatory damages against all defendants for economic losses, including attorney fees, bail bond costs, private investigator fees, lost wages, hotel costs, and the value of seized property, in an amount to be determined at trial.

3. Compensatory damages against all defendants for non-economic losses, including emotional distress, reputational harm, career impact, loss of enjoyment of life, and the inability to visit aging parents abroad, in an amount to be determined at trial.

4. Damages attributable to immigration-related consequences against all defendants, in an amount to be proven at trial, including but not limited to costs and losses proximately caused by visa revocation and delay or impairment of lawful immigration benefits.

5. Punitive damages against the Doe Defendants, later identified as the arresting and/or report-approving officers, in an amount to be determined by the trier of fact, to punish and deter willful, malicious, or reckless disregard of Plaintiff's

MAURICIO AYLLON UNZUETA V. CITY OF BERKELEY AND DOES 1 THROUGH 10   - 12

federally protected rights.

6. Attorney's fees and litigation costs against all defendants pursuant to 42 USCS § 1988, as a prevailing party in the action brought under 42 USCS § 1983.

7. Pre-judgment and post-judgment interest on all monetary awards pursuant to 28 USCS § 1961.

8. Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:

Respectfully Submitted,

**Scott A. Flaxman**

Attorney for Plaintiff,
Mauricio Unzueta

## VERIFICATION OF COMPLAINT

I, Mauricio Ayllon Unzueta, am a Plaintiff in this action and have read the foregoing civil complaint. I have personal knowledge of the facts alleged in the

complaint, and I believe the allegations to be true and accurate to the best of my knowledge and belief.

I am the Plaintiff in the above-captioned matter filed in the United States District Court for the Oakland Division.

1. I have personal knowledge of the facts stated herein and am competent to testify to the same.

2. I have reviewed the complaint filed in this matter, and I verify that the allegations and statements contained therein are true and correct to the best of my knowledge, information, and belief.

3. I understand that this verification is made under penalty of perjury under the laws of the United States of America, and that knowingly providing false information may subject me to criminal penalties.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____04/13/2026_____ at _____Alameda_____ County, California.


_____Mauricio Ayllon U._____
**MAURICIO AYLLON UNZUETA**

MAURICIO AYLLON UNZUETA V. CITY OF BERKELEY AND DOES 1 THROUGH 10   - 14

# Exhibit 1
# DECLARATION OF IBLIM NADESDA VELEZ TORRICO

Scott A. Flaxman SBN 241285
700 Larkspur Landing Circle, Suite #199
Larkspur, California 94939
(415) 702-7032

UNITED STATES DISTRICT COURT

CALIFORNIA NORTHERN DISTRICT COURT

OAKLAND DIVISION

| | |
|---|---|
| MAURICIO AYLLON UNZUETA,<br><br>Plaintiff,<br><br>V.<br><br>CITY OF BERKELEY and DOES 1 through 10,<br><br>Defendants. | Case No.:<br><br>**DECLARATION OF IBLIM NADESDA VELEZ TORRICO**<br><br>Date:<br>Time:<br>Dept.:<br>Judge:<br><br><br>Trial Date: |

I, Iblim Nadesda Velez Torrico, declare as follows:

1. My full legal name is Iblim Nadesda Velez Torrico. My date of birth is February 13, 1995.

2. I currently reside at 3400 S. Clark St., Apt 0331, Arlington, VA, 22202

DECLARATION OF IBLIM NADESDA VELEZ TORRICO  - 1

3. I am over the age of eighteen (18), I have personal knowledge of the facts stated in this declaration, and if called as a witness I could and would testify competently to the matters stated herein.

4. I make this declaration voluntarily, and I understand it is intended to be used as a supporting declaration in Plaintiff Mauricio Ayllon Unzueta's civil action in the United States District Court for the Northern District of California.

5. In or about October 2024, Mauricio and I had a heated argument while we were on the phone. During that argument, I told Mauricio I would call the police to report sex videos he had made with two other females.

6. During that same phone argument, Mauricio responded by threatening to download a sex video of Mauricio and me and display it on the internet if I called the police. He used words to the effect of: "What do you think your daughter and family will think when they see that video."

7. At that time, I became very upset and feared he might actually download and post the video online.

8. Because I feared Mauricio might post the video online, I called the Berkeley Police Department to report that issue. I considered it necessary to protect my integrity and to bring this situation to the attention of the authorities. I thought they could stop Mauricio from posting said videos.

9. I recall at least two male officers responded, and one officer was Spanish-speaking. I provided my statement to the Spanish-speaking officer.

10. What I reported to the Spanish-speaking officer was that Mauricio threatened to download and post the sex video of Mauricio and me online, and that I was scared and feared he might do that. It is my understanding that publishing a

DECLARATION OF IBLIM NADESDA VELEZ TORRICO - 2

person's intimate content on the internet is a crime, and informing the police could help prevent Mauricio from doing it.

11. During the police response, an officer asked me whether Mauricio had ever threatened my life.

12. Mauricio had never threatened to harm me in any way.

13. In response to the officer's question about whether Mauricio had ever threatened my life, I described a prior time when Mauricio and I were watching a crime documentary, and Mauricio made a spontaneous remark to the effect of: "If I ever killed you they would never find your body." I said this in response to a question the officer asked, which was whether I had ever felt afraid, and I simply answered truthfully, even though the comment had been made in a joking manner. However, when I told the officer about it, I remember that he asked me whether Mauricio had said 'I would kill you' or 'I am going to kill you.' I responded that he said 'I would kill you,' and the officer replied that those were two different things.

14. When Mauricio made that remark, we were not arguing and were simply watching the television program together. I felt afraid after that remark. However, Mauricio never mentioned anything about hurting me with metals, which is what the police officer wrote on the Emergency Protective Order and police report.

15. I tried to answer each question truthfully. However, I called the police because I wanted to protect my integrity and ensure that no intimate video of me would be posted on the internet.

DECLARATION OF IBLIM NADESDA VELEZ TORRICO - 3

16. At the time I spoke with the officer, I did not understand that the officer would interpret my description of that remark as an actual death threat. I only answered truthfully to the question of the police officer who asked if there was ever a situation where I felt afraid that Mauricio might hurt me. It is important to note that I never said anything resembling what is written in the Emergency Protective Order as it relates to Mauricio using "metals" as a means to hurt me.

17. After the police response, I later saw that the Emergency Protective Order stated that Mauricio had threatened my life.

18. I did not tell the officer that Mauricio threatened my life. When the officers asked me if I was afraid, I said yes, but my fear at that time related to the threatened posting of the private sex video online. I was overwhelmed by the number of questions the police officer asked, so I did not explain the nuance.

19. After I made my initial report, as far as I remember, the police officer called me a few times to verify Mauricio's information, inform me that he had posted a bond, and to ask how I was doing.

20. I am providing this declaration to clarify that I did not report a threat to my life, and that my fear at the time related to the threatened posting of a private sex video online.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on 04/06/2026, at Arlington, VA.

**Iblim Nadesda Velez Torrico**

DECLARATION OF IBLIM NADESDA VELEZ TORRICO  - 4